## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Edward McGrath,                                    Civil File No.: 10-4192 ADM/SER

        Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

Michael J. Astrue,

        Defendant.

Lionel H. Peabody, Esq., P.O. Box 10, Duluth, MN 55801-0010, on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 S. 4th Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

STEVEN E. RAU, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Edward McGrath ("McGrath") seeks review of the final decision of the Commissioner of Social Security's ("the Commissioner") denial of McGrath's applications for disability-insurance benefits "DIB") and supplemental security income ("SSI"). The parties filed cross motions for summary judgment [Docket Nos. 10 and 16] that have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, this Court recommends McGrath's motion for summary judgment be granted and the Commissioner's motion be denied.

## I.   BACKGROUND

### A.   Procedural History

      McGrath applied for DIB and SSI on November 4, 2005, alleging disability due to acute depression, anxiety, and alcoholism as of December 31, 2000. (Admin. R. 88-95, 122.) [Doc.

No. 6.]  McGrath's applications were denied initially and on reconsideration.  (*Id.* at 51-60, 64-69.)  He timely requested a hearing, which was held on July 15, 2008, before Administrative Law Judge David K. Gatto ("the ALJ").  (*Id.* at 70, 30-39.)  The ALJ issued an unfavorable decision on January 8, 2009.  (*Id.* at 16-29.)  On September 24, 2010, the Appeals Council denied McGrath's request for further review.  (*Id.* at 7-15, 1-5.)  The denial of review made the ALJ's decision the final decision of the Commissioner.  42 U.S.C. § 405(g); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir. 2010); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).  McGrath now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B.  Plaintiff's Background and Testimony

McGrath has a B.A. degree in Geography that he received in 1981 from the State University of New York.  (*Id.* at 33, 127, 325).[1]  The longest job he held was in sales from 1993 through 1995.  (*Id.* at 123.)  McGrath held other jobs off and on for three months or less during the period 1993 through 2004, including:  appointment setter, telephone research assistant, telephone sales representative, production operator, loan counselor, and bill collector.  (*Id.* at 131-38.)

At the hearing in July 2008, McGrath testified that he did not work much after December 2000, because he was extremely anxious and depressed.  (*Id.* at 33.)  He last went through chemical dependency treatment in October 2005, but continued to use marijuana once a week.  (*Id.* at 33-34.)  His only income was General Assistance.  (*Id.* at 34.)

---

[1]      McGrath's Certified Earnings Record contains his yearly earnings for the years 1975 through 2005.  (Admin. R. at 109-110.) Before 1984, his earnings never reached $10,000.  (*Id.*) From 1984 through 1989, his earnings fluctuated from $10,000 to $20,000 annually.  (*Id.* at 110.) In 1990, he earned only $5000, and he doubled that the next year.  (*Id.*) His highest earnings were in 1993 and 1994, when he earned a little more than $25,000 a year.  (*Id.*)  From 1995 through 2000, McGrath's earnings ranged from approximately $7,000 to approximately $13,000 annually.  (*Id.*)  McGrath's highest annual earnings between 2001 and 2005 were $2570, and his lowest annual earnings were $441 in 2004.  (*Id.*)

McGrath also described his daily activities at the hearing. He spent his time isolated in his room, listening to music, watching television, and sleeping. (*Id.*) After his last chemical dependency treatment in November 2005 he lived at Reed's Board and Lodging ("Reed's"). (*Id.* at 33-34, 36.) McGrath was scared to live on his own. (*Id.*) He used avoidance to control anger. (*Id.* at 36-37.) At Reed's, he had a place to sleep, meals were provided, and staff gave him his medications. (*Id.*) He was not certain he could do these things on his own because depression interfered with his everyday life and because of his tendency to isolate himself. (*Id.*) He was also nervous, which he believed to be genetic. (*Id.*)

McGrath does not have a driver's license because of four DWI convictions. (*Id.* at 34-35.) If he had a license, he thought he could drive, but he was unsure of whether his anxiety would interfere with his ability to drive. (*Id.* at 35.)

McGrath took several medications including Risperdal, Remeron, tramadol, ibuprofen, and Lopid. (*Id.*) Lopid "messed up" his stomach, and Risperdal and Remeron made him tired, but helped him overall. (*Id.*)

### C.    Medical Evidence

The medical records begin seven years before McGrath's hearing before the ALJ, and not long after his alleged disability onset date of December 31, 2000. In July 2001, paramedics brought McGrath to Saint Alphonsus Regional Medical Center in Boise, Idaho, to evaluate his chest pain. (*Id.* at 196-98.) McGrath had been drinking and was depressed. (*Id.* at 196.) On examination, he had a flat affect[2] and appeared sad, but was no longer experiencing chest pain. (*Id.*) During the examination, McGrath admitted he was suicidal recently. (*Id.* at 197.) Dr. Mark Henzler started McGrath on Zoloft and advised him to attend AA daily. (*Id.*)

---

[2]    A flat affect is the absence of emotional tone or outward emotional reaction typically shown by others under similar circumstances. *Stedman's Medical Dictionary* 32 (27th ed. 2000).

McGrath then voluntarily admitted himself to Intermountain Hospital for severe depression on August 23, 2001.  (*Id.* at 191.)  He had been drinking and again experienced suicidal ideation.  (*Id.*)  Dr. David Kent ("Dr. Kent") noted McGrath was living at the Boise Rescue Mission and had a long history of alcohol dependence and some history of depression. (*Id.*)

McGrath had quit his job three weeks earlier and explained that he had been working menial jobs, which he could no longer tolerate.  (*Id.*)  He had a history of binge drinking, with only two or three months as a maximum period of sobriety.  (*Id.*)  He also had a history of violence when he drank.  (*Id.*)  He experienced mood swings, at times with elevated mood, racing thoughts, and increased energy.  (*Id.*)  McGrath was not on any medications at that time. (*Id.*)

On mental status examination, McGrath's mood was "a little bit down," and his affect was "slightly restricted."  (*Id.* at 192.)  Otherwise, his mental status was intact.  (*Id.*)  He had no thoughts of suicide or homicide.  (*Id.*)  Dr. Kent diagnosed bipolar affective disorder, depressed versus major depressive disorder, and alcohol dependence.  (*Id.*)  He assessed McGrath with a GAF score of 35.[3]  (*Id.*)  McGrath was admitted to the hospital for detoxification.  (*Id.*)  He was

---

[3]      The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning."  *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") (4th ed. text revision 2000)).  GAF scores of 21-30 indicate serious impairment in communication or judgment or inability to function in almost all areas; scores of 31-40 indicate some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; scores of 41-50 indicate serious symptoms (e.g., suicidal ideation) or any serious impairment in social, occupational, or school functioning; scores of 51-60 indicate moderate symptoms (e.g., flat affect or occasional panic attacks) or moderate difficulty in  social, occupational, or school functioning; and scores of 61-70 indicate some "mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning."  *DSM-IV-tr* at 34.

also started on Celexa for depression.  (*Id.*)   Although Celexa improved his mood, he experienced a side effect of daytime sedation.  (*Id.*)  He was very motivated and goal-directed during treatment.  (*Id.*)  McGrath's GAF score increased to 55.  (*Id.*)  Approximately a week later, McGrath returned to Saint Alphonsus Regional Medical Center, reporting he had been assaulted and lost consciousness.  (*Id.* at 194.)  His speech was slurred, but he was otherwise neurologically intact.  (*Id.* at 195.)  When McGrath said he was homeless and did not have any family or friends, social services became involved.  (*Id.*)  He left the hospital on his own.  (*Id.*)  The next day, McGrath went to the emergency room intoxicated.  (*Id.* at 211.)  A CT scan of his face showed sinus fractures, and he had chest wall and abdominal contusions.  (*Id.* at 212.)  He was started on antibiotics and pain medication.  (*Id.*)

McGrath's next medical record is almost four years later.  On August 14, 2005, McGrath went to the emergency room at St. Mary's Medical Center in Duluth, Minnesota and was suicidal.  (*Id.* at 228-31, 289-90.)  He had been stranded in Minnesota while driving cross country with a friend and was spending his time in a hotel drinking.  (*Id.* at 230.)  He had taken methadone and Oxycontin he bought on the street.  (*Id.*)  He claimed he wanted to die but reconsidered and called 911 after taking "five doses" of methadone.  (*Id.*)  On mental status examination, McGrath was depressed and talking about suicide.  (*Id.* at 231.)  Dr. James Bork ("Dr. Bork") assessed a GAF score of 25.  (*Id.*)  McGrath was started on fluoxetine and was referred for chemical dependency evaluation.  (*Id.*)

McGrath was discharged from the hospital on August 23, 2005.  (*Id.* at 228.)  His discharge diagnoses were adjustment disorder with disturbance in mood, status post overdose; marijuana dependency; alcohol dependency; and narcotic abuse.  (*Id.*)  His GAF score on discharge was 50.  (*Id.*)  The next week, McGrath became homeless after "his money ran out."

(*Id.* at 214, 223.)  He had been living on an inheritance.  (*Id.* at 257.)  He saw Social Worker Jacqueline Lund ("Lund") at Behavioral Health Access Center in Duluth that day.  (*Id.*)  He reported being suicidal and was also contemplating robbing a bank.  (*Id.*)  He wanted to be hospitalized, and he was not on medications because he could not afford prescription drugs.  (*Id.*)

McGrath was depressed and tearful, and complained of high anxiety.  (*Id.* at 215.)  He admitted to suicidal thoughts, claiming he came close to cutting his wrist the previous night. (*Id.*)  Lund diagnosed depressive disorder, not otherwise specified ("NOS");[4] alcohol and marijuana dependence; and she assessed a GAF score of 30.  (*Id.*)  She noted McGrath had no source of income and was estranged from his family.  (*Id.*)  McGrath was admitted to Miller Dwan Medical Center ("Miller Dwan").  (*Id.* at 225-27.)

About a week later, McGrath was transferred to chemical dependency treatment at the Aurora Four Winds Program ("Four Winds").  (*Id.* at 223.)  Just before the transfer, Dr. Bork stated, "Patient is recommended to avoid alcohol, complete chemical dependency treatment. Patient has two college degrees (according to 'his Idaho records')[5], and did not appear to be disabled during his hospitalization.  Recovery, sobriety and work rehabilitation appears indicated." (*Id.*)

Upon admission to Four Winds, McGrath stated that his longest full-time job lasted one month.  (*Id.* at 249.)  He had a four-year degree, "but [due] to his use [was] having problem[s] maintaining employment."  (*Id.*)  McGrath had three brothers, but he did not have contact with them.  (*Id.* at 251.)  His parents had passed away, and he had been divorced for seven years,

---

[4]      Depressive Disorder Not Otherwise Specified is diagnosed when the clinician has concluded that a depressive disorder is present but is unable to determine whether it is primary, due to a medical condition, or substance induced, or when the claimant does not meet the criteria for other depressive disorders.  *DSM-IV-tr* 381-82.  The same is true for Anxiety Disorder, NOS. *Id.* at 484.

[5]      *See* Admin. R. at 225.

spending most of his free time alone.  (*Id.* at 251-52, 255.)  During his lifetime, he had serious problems getting along with family and friends.  (*Id.* at 252.)  His first and second chemical dependency treatments followed his DWIs[6] in 1986 and 1996.  (*Id.* at 255.)

McGrath reported that he had psychological problems of serious depression; anxiety; trouble concentrating, understanding, and remembering; difficulty controlling violent behavior; and suicidal ideation.  (*Id.* at 253.)  His typical day consisted of eating, smoking marijuana, walking, napping, and drinking.  (*Id.* at 254.)  McGrath was diagnosed with polysubstance dependence; depressive disorder, NOS; and anxiety disorder, NOS.  (*Id.* at 256.)  Although he attended programming, he attempted to rationalize, justify, and minimize his chemical use.  (*Id.* at 246.)  He had conflicts with a counselor and was discharged on November 2, 2005 due to negative behaviors.  (*Id.* at 245-46, 264.)  In a group setting, he told others he went to treatment just so he could get into a halfway house.  (*Id.* at 246.)

About two months after McGrath was discharged from chemical dependency treatment, Dr. Sharon Frederiksen ("Dr. Frederiksen"), a state agency psychological consultant, completed a Psychiatric Review Technique Form regarding McGrath for the Social Security Administration ("SSA").  (*Id.* at 294-307.)  Dr. Frederiksen reviewed McGrath's medical records and concluded that he had an affective disorder, a personality disorder, and a substance addiction disorder, but currently was sober.  (*Id.* at 297, 301-02, 304.)  In evaluating McGrath under SSA's "Listing of Impairments," she opined that McGrath's mental disorders mildly restricted his activities of daily living; caused moderate difficulties in social functioning; and caused moderate difficulties in maintaining concentration, persistence, or pace; and that McGrath experienced no episodes of

---

[6]     The record inconsistently refers to McGrath's convictions as both DWIs and DUIs.  (*Id.* at 34-35, 255).  The Court will refer the convictions as DWIs based on McGrath's testimony at the hearing.

decompensation.  (*Id.* at 304.)  She further opined that McGrath had sufficient mental capacity to concentrate on, understand, remember, and carry out routine, three- to four-step, and limited detail tasks with adequate persistence and pace.  (*Id.* at 310.)  She recommended contact with co-workers and the public should be brief.  (*Id.*)  She suggested McGrath could handle "reasonably non-authoritarian supervisory styles that could be expected to be found in many customary work settings," and his ability to handle work stress would be adequate for routine stresses of a routine, repetitive, three- to four-step, limited detail work setting.  (*Id.*)

Four days after Dr. Fredericksen completed her review of McGrath's medical records, McGrath saw Dr. Alan Johns ("Dr. Johns") at Duluth Clinic for a physical exam and treatment for depression, anxiety, and back pain.  (*Id.* at 363.)  Dr. Johns noted McGrath had two suicide attempts, once by purposefully causing a car crash in 1996 and again by taking a methadone overdose on August 14, 2005.  (*Id.*)  At that time, McGrath felt depressed, but not suicidal, and severely agitated, arguing with other residents at the facility where he lived.  (*Id.*)  Dr. Johns diagnosed chronic depressive disorder with chemical dependency issues and prescribed Zoloft. (*Id.* at 364.)

McGrath saw Nurse Alice Skadsberg ("Skadsberg") in the Duluth Clinic Psychiatry Department on February 9, 2006, for further treatment of depression.  (*Id.* at 359.)  Aside from a depressed mood, he suffered from difficulty sleeping, poor memory, guilt, low self-esteem, crying spells, suicidal thoughts, racing thoughts, anger management problems, and anxiety.  (*Id.*) He used alcohol twice after his treatment in November 2005 and he continued to use marijuana. (*Id.* at 360.)  McGrath's mental status examination revealed depressed mood and distractible, racing thoughts.  (*Id.* at 360-61.)  Skadsberg diagnosed depressive disorder, anxiety state,

borderline personality disorder, and she assessed a GAF score of "55 with suicidal thought." (*Id.* at 361.)

Approximately a month and a half later, McGrath followed up with Dr. Johns and reported that tramadol was helping his back pain and his depression was improving. (*Id.* at 316.) The next week, however, Skadsberg increased his Seroquel to treat panic and anxiety and also increased his Zoloft. (*Id.* at 357.)

On June 14, 2006, McGrath was admitted to Miller Dwan for partial hospitalization to treat depression.[7] (*Id.* at 312.) His depression was preventing him from leaving the house, and he also had anxiety with panic attacks. (*Id.*) He discontinued the program after three days (the program was designed for seven days), because his anxiety was too high to participate in groups. (*Id.*)

When McGrath followed up with Nurse Kate Campbell ("Campbell") at Duluth Clinic on July 7, 2006, he asked to be prescribed Ativan for anxiety. (*Id.* at 318.) He said he worked a responsible and skilled job in the past, until he was taken off Ativan. (*Id.*) Campbell declined to prescribe Ativan due to its addictive potential. (*Id.*) She referred McGrath to a psychiatrist to adjust his medications. (*Id.* at 319.)

Four months later, McGrath underwent a psychological consultative examination with Dr. Marcus Desmonde ("Dr. Desmonde"), regarding his application for Social Security disability benefits. (*Id.* at 325-26.) McGrath felt his problems started in 1996 after he was injured in a motor vehicle accident and his wife left him. (*Id.* at 325.) He had many injuries, became

---

[7]     The Miller Dwan partial hospitalization program for adults includes a variety of mental health treatment services, six hours each day, four days a week. http://www.smdcmedicalcenter.org/MedicalSpecialties/BehavioralHealth/AdultServices.aspx

addicted to narcotic pain medication, and overdosed. (*Id.*)   Recently, he was dependent on alcohol and marijuana. (*Id.*)  He also had two hospitalizations for treatment of depression. (*Id.*)

McGrath lived in a board and lodging facility with three other adults. (*Id.* at 326.)  Staff dispensed the medications at this facility. (*Id.*)  McGrath's day consisted of sleeping and watching television. (*Id.*)  He reported that he stayed to himself but got along "pretty well" with the other residents. (*Id.*)  On mental status examination, McGrath said he had not consumed alcohol for a couple of days. (*Id.*)  He drank and smoked marijuana occasionally, and did not consider it a problem. (*Id.*)  The Court notes this is the last time McGrath reported recent consumption of alcohol to any provider, and there is no other evidence in the record suggesting he drank alcohol after this date.  Therefore, the Court concludes McGrath's sobriety began at or about the time of his consultative examination with Dr. Desmonde.

McGrath admitted to Dr. Desmonde that he suffered symptoms of hopelessness, suicidal ideation, social isolation, and overdosing on medication and street drugs when available. (*Id.*) He denied symptoms of anxiety or panic at that time. (*Id.*)   He was oriented and his concentration was average. (*Id.*)

Dr. Desmonde diagnosed alcohol dependence, marijuana dependence, mood disorder secondary to alcohol and marijuana dependence, and major depressive disorder. (*Id.* at 327.)  He opined that McGrath's GAF score ranged between 40-55 over the last six months. (*Id.*)  Dr. Desmonde opined:

> Mr. McGrath would require a payee if benefits are awarded due to his alcohol and cannabis dependence.  He does appear capable of understanding simple to moderately complex instructions and would be able to carry out tasks within limitations set by a treating or evaluating physician.  He would have difficulty interacting with supervisors, co-workers and the general public, and would not be able to tolerate the stress and pressure of competitive employment at this time.  Completion of an AODA treatment program and

maintenance of sobriety may well enhance his abilities to return to employment in the future.

(*Id.*)

After the consultative examination, McGrath sought treatment for anxiety issues, and Skadsberg referred him to Psychologist Todd Heggestad ("Heggestad"). (*Id.* at 352.) On November 8, 2006, McGrath told Heggestad he had been sober for nine months and his boarding facility provided him with a stable environment. (*Id.*) McGrath also said he was isolated due to his anxiety. (*Id.*) He reported pain in his chest, elevated heart rate and breathing, and increased pain in his low back. (*Id.*) Heggestad started treatment by teaching McGrath relaxation techniques. (*Id.*) McGrath was mentally better the next month but still found that time of year particularly hard for him. (*Id.* at 351.)

When McGrath next saw Dr. Johns on May 16, 2007, he reported worsening depression related to his housing situation. (*Id.* at 348.) When McGrath saw Skadsberg the following month, he was getting into trouble for angrily snapping at people. (*Id.* at 347.) He was isolated himself, did nothing, and did not want to make friends. (*Id.*) He said he hated life, and Skadsberg thought he looked angry. (*Id.*) Dr. Johns discontinued Zoloft and started McGrath on Remeron and Risperdal. (*Id.*) He also discontinued Seroquel because it was not helping and caused fatigue. (*Id.*)

When he saw Skadsberg on August 23, 2007, McGrath reported improvement. (*Id.* at 346.) He was looking forward to moving out on his own. (*Id.*) He talked about having anxiety since he was a kid. (*Id.*) Skadsberg increased his Remeron. (*Id.*)

Unfortunately, when McGrath saw Skadsberg five months later, in February 2008, he reported being in the worst depression ever; his anxiety had increased, and he could not relate the increase to any particular incident or thing. (*Id.* at 345.) He had not moved out of the boarding

facility and hated it there. (*Id.*) Skadsberg noted McGrath appeared irritable and anxious; he had a hand tremor and was jittery and angry. (*Id.*) He reported he was not drinking and had cut back on marijuana. (*Id.*) Skadsberg increased McGrath's medications. (*Id.*) The next month, McGrath told Dr. Johns his depression was better due to a change in the weather. (*Id.* at 344.)

On April 2, 2008, McGrath told Heggestad that he was angry at his family stemming from childhood issues, irritable with others, and depressed about where he was living. (*Id.* at 343.) He attributed his anxiety to genetics and felt it prevented him from functioning in a job or in social situations. (*Id.*) At the end of the month, McGrath reported he was isolating himself in his room and had quit going to the YMCA in protest over a fee increase. (*Id.* at 342.) He was smoking marijuana every other day. (*Id.*) Heggestad encouraged McGrath to continue swimming to minimize depression and anxiety. (*Id.*)

On May 30, 2008, Skadsberg noted McGrath looked happier, but he reported extreme fatigue and nightmares. (*Id.* at 341.) His anger, depression, and anxiety were relieved partially. (*Id.*) Two weeks later, McGrath was inactive and unmotivated. (*Id.* at 340.) He was unhappy with his housing, and he hoped to get disability benefits so he could move out on his own. (*Id.*) Heggestad encouraged him to walk thirty minutes each day, as a starting point to decrease depression. (*Id.*) McGrath's administrative hearing on his application for Social Security disability benefits was held approximately six weeks later, in July 2008. (*Id.* at 30-39.)

In December 2008, McGrath was avoiding the other men at the lodging facility, because they drank and got into trouble. (*Id.* at 388.) He walked daily but quit when it got cold. (*Id.*) He felt sorry for himself and was "putting all his eggs in the SSDI basket," as a way to pay for a place of his own. (*Id.*) He felt, however, that his medications were working, and he was not suicidal. (*Id.*)

McGrath submitted additional medical records to the Appeals Council after the ALJ denied his claims for benefits.  (*Id.* at 4.)  On January 23, 2009, after he was denied disability benefits, McGrath described his anxiety as paralyzing.  (*Id.* at 387.)[8]  His mind was racing, and he could not sit still.  (*Id.*)  He was afraid of losing his housing, but he did not want to be at the boarding facility forever.  (*Id.*)  He felt hopeless, and his suicidal tendencies increased because he was sleep deprived.  (*Id.*)  Skadsberg opined that he needed to work part time, just to get used to it.  (*Id.*)  She increased his medications and added Klonopin.  (*Id.*)

The next week, McGrath returned to see Skadsberg and reported feeling terrible.  (*Id.* at 386.)  On examination, he was rocking back and forth, repeating himself, and asking for something to help him sleep.  (*Id.*)  He appeared stressed and looked physically ill.  (*Id.* at 387.)  His blood pressure and pulse were elevated, possibly due to anxiety and Risperdal side effects.  (*Id.*)  Skadsberg discontinued Risperdal and Remeron and started Ambien.  (*Id.*)

McGrath underwent a psychological rehabilitation evaluation with Heggestad two days later.  (*Id.* at 394-95.)  McGrath reported increased depression and anxiety, he appeared sad, he was rocking back and forth, and his legs were shaking.  (*Id.* at 394.)  He had daily suicidal thoughts with a plan to slash his wrists, but there were no knives available to him.  (*Id.* at 395.)  He did not sleep the previous two nights, and his days consisted of lying around listening to music.  (*Id.*)  He scored 49 on the Beck Depression Inventory, indicating severe depression.  (*Id.*)  Heggestad assessed a GAF score of 50.  (*Id.*)

---

[8]     Although this medical record was created after the administrative hearing and after the ALJ denied McGrath's disability claim on January 8, 2009, it is not on the list of records that the Appeals Council considered.  (Admin. R. at 4.)  This appears to be an unintentional omission because the record was made part of the administrative record, along with the other new medical records the Appeals Council considered.

McGrath was admitted to St. Luke's Hospital on February 9, 2009, because he had been unable to sleep for a week and became agitated with suicidal thoughts.  (*Id.* at 372.)  He tried Ambien for sleep with no relief, and he had been prescribed Klonopin for anxiety.  (*Id.*)  McGrath admitted smoking marijuana in the last few days but denied alcohol use.  (*Id.*)  Dr. Monica Miles ("Dr. Miles") opined that McGrath's condition was exacerbated by a viral infection and restless leg syndrome, a side effect of Risperdal, interfering with his sleep.  (*Id.* at 374.)

While he was hospitalized, Psychologist Nancy Rectenwald ("Rectenwald") interviewed McGrath and opined "it is very clear that he has really no connections to anyone in the world." (*Id.* at 377.)  On mental status examination, his affect was very depressed, and he reported often feeling paranoid.  (*Id.* at 377-78.)  McGrath did not have a suicide plan but continued to feel suicidal.  (*Id.* at 378.)  He seemed to have "good judgment and insight into how his inability to connect with others in addition to his alcoholism has contributed to a very, very lonely life." (*Id.*)  Rectenwald diagnosed anxiety disorder, NOS, and social anxiety.  (*Id.*)  She assessed a GAF score of 50.  (*Id.*)

McGrath was discharged from the hospital on February 23, 2009.  (*Id.* at 370.)  Upon discharge, Dr. Miles noted that when McGrath's depression started to improve, "it became obvious that he was a worrier and he was demonstrating anxiety which appears to be generalized anxiety disorder in nature."  (*Id.*)  He responded to Ativan.  (*Id.*)  Dr. Miles recommended following up with partial hospitalization.  (*Id.*)

McGrath began partial hospitalization at Miller Dwan on March 23, 2009.  (*Id.* at 383-84.)  When he was discharged on April 10, 2009, Social Worker Thomas Jansen noted McGrath had more hope, increased motivation, and improved self-esteem.  (*Id.* at 385.)  McGrath

identified his need to be more assertive and less avoidant.  (*Id.*)  He benefitted from the structure

of the program and worried he would slip after discharge.  (*Id.*)  His GAF score was 65, and he

was encouraged to follow up with outpatient providers.  (*Id.*)

McGrath returned to treatment with Heggestad on April 6, 2009, and was sleeping better,

but still had thoughts that fueled his depressive thinking.  (*Id.* at 392.)  Heggestad recommended

more exercise and less isolation.  (*Id.* at 392-93.)  Two days later, McGrath saw Skadsberg and

reported sleeping better.  (*Id.* at 386.)  His legs shook when he talked, but he was less fatigued.

(*Id.*)  He promised to search for a job and wanted to leave the boarding facility by the fall of that

year.  (*Id.*)  In June 2009, McGrath attempted to exercise and socialize more.  (*Id.* at 390.)  He

continued these activities, but his depression was up and down.  (*Id.* at 389.)

### D.      Vocational Expert Testimony

Mitchell Norman ("Norman") testified as a vocational expert ("VE") at the hearing

before the ALJ.  (*Id.* at 30.)  The ALJ asked Norman a hypothetical question about a man

between the ages 42 and 50, with more than a high school education, and the same work history

as McGrath.  (*Id.* at 37.)  The hypothetical man had impairments of poly-substance dependence,

depression and anxiety.  (*Id.*)  He would be limited to a range of unskilled to low-end semiskilled

work with brief and superficial contact with co-workers and the public, with no rapid or frequent

changes in work routine to account for reduced stress tolerance.  (*Id.*)  The ALJ asked whether

such a person could perform any of McGrath's past work.[9]  (*Id.*)

Norman testified such a person could perform the jobs of telemarketer and appointment

setter.  (*Id.* at 38.)  The ALJ asked whether there would be any other type of work in the State of

Minnesota that such a person could perform.  (*Id.*)  Norman identified the positions of kitchen

---

[9]      Norman prepared a vocational report identifying McGrath's past work.  (Admin. R. at 177.)  McGrath also completed a work history report.  (*Id.* at 131-38.)

helper and hand packager.  (*Id.*)  Norman also testified that if the hypothetical man was absent from work three or more days per month or did not complete eight-hour days of work, he would be unemployable.  (*Id.*)

### E.      The ALJ's Decision

The ALJ issued an unfavorable decision on January 8, 2009.  (*Id.* at 16-29.)  In finding that McGrath was not disabled, the ALJ employed the five-step evaluation considering: (1) whether he was engaged in substantial gainful activity; (2) whether he had a severe impairment; (3) whether his impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether he was capable of returning to past work; and (5) whether he could do other work existing in significant numbers in the regional or national economy.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).

At the first step of the evaluation, the ALJ found that McGrath had not engaged in substantial gainful activity since the alleged onset date of December 31, 2000, although he had worked a variety of part-time, sporadic jobs with earnings that had not risen to the substantial gainful activity level.  (Admin. R. at 21.)  At the second step, the ALJ determined that McGrath had severe impairments of polysubstance dependence; depression, NOS; and anxiety, NOS.  (*Id.*)

At step three, the ALJ determined that McGrath did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 22.)  The ALJ noted evidence that McGrath was chemically dependent with his last treatment in September or October 2005, and that he continued to use marijuana regularly.  (*Id.*)  The ALJ concluded the records showed improvement of McGrath's condition "with sobriety and the compliant use of medications." (*Id.*)

The ALJ found, under the "B criteria" of listings 12.04, 12.06, 12.08, and 12.09, that McGrath had mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (*Id.* at 22-23.)   Furthermore, the ALJ did not find evidence to establish that the "C criteria" of the listings were met.  (*Id.* at 23.)

At step four, the ALJ found that McGrath had no physical limitations but was mentally "limited to unskilled or low-end semi-skilled tasks, with no more than brief and superficial contact with the public and co-workers; and, no rapid or frequent changes in work routine to allow for reduced stress tolerance."   (*Id.*)   In reaching this RFC determination, the ALJ considered the extent to which all symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence."   (*Id.* (citing 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p, 96-7p.))

The ALJ found the objective medical evidence and treatment record did not warrant "greater residual functional capacity reductions."   (*Id.* at 24.)   He also found the medical opinions, claimant's daily activities, and work record inconsistent with disability.  (*Id.*)  The ALJ summarized Dr. Desmonde's report and concluded:

> [t]he reported activities of daily living described above are within the scope of the residual functional capacity and accommodate his moderate limitations in maintaining social functioning and concentration, persistence and pace.  The successful treatment with medications does not support disability.  The treatment has been conservative and generally successful. . . .  The claimant's inconsistent compliance with the prescribed medication and excessive abuse of drugs and alcohol during periods of non-compliance does not bolster his credibility.  The fact that the medications reduce his symptoms with minimal side-effects does not support his allegations of total disability. . . the mental status examination does not support a total disability and inability to perform all work.

(*Id.* at 25-26.)

The ALJ stated, "[c]learly, substance abuse negatively impacts the claimant's overall functioning but not to the extent that he can be considered totally disabled as a result of substance abuse for a continuous period of 12 months or more." (*Id.*) The ALJ further concluded:

> Dr. Marcus P. Desmonde's opinion clearly shows that, when abusing substances the claimant's functioning is reduced, but when clean and sober, he is able to sustain normal activities of daily living and at least low to semi-skilled level work. . . . The State Agency Medical Consultants reported that they did not find disability, because the claimant's mental condition improves when he is on medications and compliant but declines with increased substance abuse. The undersigned fully endorses the conclusion of the State Agency Medical Consultants and gives significant weight to the opinion of Dr. Desmonde . . . The objective medical evidence shows no ongoing mental health care, and no ongoing mental health symptoms. However, the evidence shows some situational anxiety or depression exacerbations when he runs out of funds and has housing problems. A report from Dr. Bork dated August 31, 2005 indicates the claimant is able to work. The record shows that he has been uncooperative with chemical dependency treatment and he had not followed medical recommendations to go out for walks and be more communicative with others and to stay sober and medically compliant. He testified that he has no problems managing his own finances and self-care needs. The claimant was noted to be manipulative in one treatment setting reporting no desire for sobriety and that he just went into treatment just to gain housing. The record contains reports that he was benefit seeking. The claimant is not fully credible.

(*Id.* at 26-27.)

The ALJ considered medical records from Duluth Clinic between January 2006 and June 2008, and he noted McGrath was primarily seen for his mental impairments, and he did not report side effects from medications. (*Id.* at 27.) The ALJ stated, "[h]e seems to be relying on getting disability benefits instead of improving his lifestyle and looking for gainful work. His

only income is from public assistance and he admits to continuing with substance abuse." (*Id.*) The ALJ concluded:

> The undersigned is not persuaded that the claimant is unable to work fulltime or at sustained gainful levels due to the fact that he has shown an ability to work since the date of onset, and his daily activities are inconsistent with total disability and his treatment has been conservative and generally successful and the objective medical evidence does not support a finding of disability. When the claimant is clean and sober and medically compliant his symptoms improve and stabilize and he retains the residual functional capacity to perform gainful work. While the record is indicative of disability during episodes of substance abuse, there is no objective evidence that any of these periods have lasted for a continuous period 12 months or more during the period at issue.

(*Id.* at 28.)  Based on the VE's testimony, the ALJ concluded McGrath could perform his past relevant work as an appointment setter and telemarketer.  (*Id.* at 29.)  Alternatively, the ALJ relied on the VE's testimony that there were other jobs existing in significant numbers in the national economy that McGrath could perform.  (*Id.*)

## II.  STANDARD OF REVIEW

Congress prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death.  *Id.* § 423(d)(1)(A).

## A.      Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, he or she may request Appeals Council review, although that is not automatic.  20 C.F.R. §§ 404.967-979, 416.1480.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

## B.      Judicial Review

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); *Hutsell v. Sullivan*, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The review is "more than a search for the existence of substantial evidence supporting the [Commissioner's] findings."  *Brand v. Sec'y of Dep't of Health, Ed. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 484-85 (1951)); *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir. 1991).

The reviewing court must review the record and consider:

1.      The credibility findings made by the ALJ;
2.      The plaintiff's vocational factors;

3.      The medical evidence from treating and consulting physicians;

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.      Any corroboration by third parties of the plaintiff's impairments;

6.      The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion.  *Tellez*, 403 F.3d at 956; *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).  In reviewing the record for substantial evidence, the court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider, "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the evidence and one of those positions supports the Commissioner's decision, the court must affirm that decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

If alcohol or drug abuse is a contributing factor material to disability, the claimant is not entitled to benefits.  42 U.S.C. § 423(d)(2)(C).  The ALJ must follow special procedures when drug addiction and/or alcoholism are at issue.  The ALJ is "required first to consider whether a claimant is disabled, regardless of cause, before determining whether substance abuse was a contributing factor."  *Kluesner v. Astrue*, 607 F.3d 533, 538 (8th Cir. 2010); *Brueggemann v. Barnhart*, 348 F.3d 689, 694, n.2 (8th Cir. 2003) (noting 20 C.F.R. § 404.1535 requires the ALJ to first determine whether the claimant is disabled, considering substance use disorders together with the claimant's other impairments).  If the ALJ cannot determine "whether substance use

disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, then a claimant's burden has been met and an award of benefits must follow." *Id.* at 693 (citations omitted). Stated more directly, "a tie goes to [the claimant.]" *Id.*

## III. DISCUSSION

McGrath contends that the Commissioner's decision is erroneous in several ways. First, he contends he met Listings 12.04 and 12.06. Second, he argues the ALJ erred in evaluating the medical opinions. Third, he asserts the ALJ failed to fully develop the credibility factors, and further made erroneous credibility findings. Finally, McGrath contends the ALJ erred in finding him able to perform past relevant work, because he only performed the past work cited by the ALJ for several months.

### A.       The ALJ's Drug Addiction and/or Alcoholism Evaluation

The ALJ did not perform the five-step disability analysis including all of McGrath's limitations before considering whether alcohol or drug abuse was a material factor contributing to disability. *See Bruegemann v. Barnhart*, 348 F.3d at 694 (noting 20 C.F.R. § 404.1535 requires the ALJ to follow the standard five-step analysis under § 404.1520 without segregating out any effects that might be due to substance use disorders before considering which limitations would remain when the effects of substance use disorders are absent). Nonetheless, the ALJ concluded McGrath was disabled during periods of substance abuse,[10] but not for a continuous period of twelve months during the relevant time frame. (Admin. R. 26.) The parties do not challenge the ALJ's drug addiction and alcoholism evaluation. *See Fastner v. Barnhart*, 324 F.3d 981, 986 (finding determination of whether substance abuse was a material factor

---

[10]       The ALJ did not identify the specific periods when McGrath was disabled by alcohol abuse, but such periods are obvious from the record. Presumably, the ALJ concluded McGrath's marijuana use did not render him disabled, because McGrath never stopped using marijuana, and the ALJ found he was not disabled.

contributing to disability was superfluous where ALJ determined the sum of individual's impairments, including substance addiction, would not amount to a finding of disability). This Court, therefore, will not further evaluate this aspect of the ALJ's decision.

###### B. The ALJ's Evaluation of Listings 12.04 and 12.06

The Listing of Impairments "describes for each of the major body systems" the severity of impairments that would "prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). "To meet the requirements of a listing, [the claimant] must have a medically determinable impairment(s) that satisfied all of the criteria in the listing." *Id.* at §§ 404.1525(d), 416.925(d). The parties disagree only as to whether McGrath meets the "B criteria" of Listings 12.04 (affective disorders) and 12.06 (anxiety disorders) or, alternatively, the "C criteria" of Listing 12.04.

The "B criteria" of Listings 12.04 and 12.06 are the same and require evidence that the mental impairment(s) result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(B), 12.06(B). A limitation is "marked" when several activities or functions are impaired," or one is impaired such that it interferes seriously with the ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00C.

The ALJ did not have the opportunity to consider the medical records dated from January 23, 2009 through June 2009, because the records were created and supplemented the record after the ALJ's disability determination. "When the Appeals Council has considered material new evidence and nonetheless declined review," the court's "task is only to decide whether the ALJ's

decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ." *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995). This Court, therefore, considers the 2009 medical evidence.

The first element of the "B Criteria" is the level of restriction in the claimant's activities of daily living caused by his mental impairments. The ALJ found only a mild restriction based on the following activities: "he prefers to stay in his room and listen to music, watch television and sleep. . . . He manages his self-care needs and finances. He is able to do laundry and take daily walks of about 30 minutes duration." (*Id.* at 22.) "Due to his sobriety problems, Mr. McGrath lives in a board and lodging living arrangement. The staff provides for his medications and medical appointments." (*Id.*)

A person who prefers to stay in his room during the day and lives in a board and lodging facility, where meals are provided and medication is monitored, has much more than a mild restriction in activities of daily living. Simply because McGrath can do laundry and go for a daily does not preclude a determination of disability. *See Reed v. Barnhart*, 399 F.3d 917, 922-23 (8th Cir. 2005) (finding ability to fix meals, watch movies, check mail, and do laundry not inconsistent with disability). The ALJ attributes the fact that McGrath lived in the board and lodging facility to his sobriety problems; however, McGrath lived in the facility for years after his sobriety in November 2006. McGrath was treated for depression and anxiety from November 2006 through June 2009, as an outpatient and with hospitalization and partial hospitalization unrelated to alcohol abuse. It is reasonable to conclude that if McGrath's depression and anxiety significantly improved after he stopped drinking, he would do more than isolate in his room in a place where he hated living, only going out for a daily walk. This Court

finds McGrath suffered marked restrictions in daily activities attributable to his mental impairments prior to November 2006 (his sobriety date) through June 2009.

The second element of the "B criteria" of the listings is the level of difficulty in social functioning.  The ALJ does not describe McGrath's difficulties in social functioning, other than finding that McGrath has only moderate difficulties.  The only evidence in the record as a whole that supports this finding is that McGrath told Dr. Desmonde that he gets along "pretty well" with others in the boarding facility.  But this is based on a report from November 2006.  There is no evidence that McGrath integrated socially after that date. The overwhelming bulk of evidence is that McGrath was impaired markedly in social functioning due to his severe isolation and anger management problems, even when abstaining from alcohol.  (*See* Admin. R. at 36, 326, 341-43, 345, 347, 352, 359, 392-93.)

The ALJ found McGrath's condition improved when he was sober and compliant with medications.  This conclusion is based on a superficial review of the record.  True, McGrath improved at times with medication adjustments between November 2006 and June 2009, but it was never long before he returned to isolating himself because he was angry, irritable, depressed, and/or anxious.   The Court also finds it immaterial that these emotions may have been "circumstantial," as the ALJ noted, because the record shows that McGrath chronically responded to his disappointments, even when he was not using alcohol, with severe depression and anxiety that was incapacitating.

Rectenwald's and Dr. Miles' insight from treating McGrath during his February 2009 hospitalization sums up how McGrath's mental impairments affected his social functioning. Rectenwald stated, "it is very clear that he has really no connections to anyone in the world." (*Id.* at 377.)   Dr. Miles stated that "his inability to connect with others in addition to his

alcoholism has contributed to a very, very lonely life." (*Id.* at 378.)  She also noted that when McGrath's depression started to improve with hospitalization, "it became obvious that he was a worrier and he was demonstrating anxiety . . . ." (*Id.* at 370.)  McGrath frequently complained of anxiety and said it was present since childhood.

The Court finds substantial evidence in the record that McGrath met a listing, because he was severely limited in two of the elements of Listing 12.04(B) for a continuous twelve month period during which he abstained from alcohol.  The onset date of November 2, 2006 is chosen because McGrath was abstinent from alcohol but receiving treatment for severe depression beginning on that date and continuing for a period of more than twelve consecutive months.  This Court, therefore, recommends reversal of the ALJ's decision with an award of benefits beginning November 2, 2006.  The Court notes that McGrath showed improvement after his partial hospitalization, ending in April 2009.  If McGrath sustained that improvement, which cannot be determined on this record, then his disability may not have continued.[11]  Although the Court recommends reversal, for the sake of completeness, the Court will discuss the ALJ's RFC determination, and particularly, his evaluation of the medical opinions.

### B.     The ALJ's RFC Determination and Evaluation of the Medical Opinions

A person's residual functional capacity is the most the person can do in a work setting, despite limitations from his or her physical and mental limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a).  In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record.  *Id.*  An ALJ's RFC determination "must be based on medical evidence that addresses the claimant's ability to function in the workplace."  *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th

---

[11]     "There is a statutory requirement that, if you are entitled to disability benefits, your continued entitlement to such benefits must be reviewed periodically. . . .  We must determine if there has been any medical improvement in your impairment(s) . . . ."  20 C.F.R. § 404.1594; *see also* 20 C.F.R. § 416.989 (continuing disability review).

Cir. 2004). "The regulations also provided that, when evaluating a nonexamining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'" *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(3)) (citing § 404.1527(f)).

The ALJ considered all of the evidence in the record in arriving at his RFC determination; however, the Court agrees with McGrath that the ALJ relied heavily Dr. Desmonde's consultative report without recognizing that Dr. Desmonde's opinion was in fact consistent with disability. Dr. Desmonde opined "[McGrath] would have difficulty interacting with supervisors, co-workers and the general public, and would not be able to tolerate the stress and pressure of competitive employment at this time." (*Id.* at 327.) Dr. Desmonde only speculated that McGrath might be able to work if he successfully went through chemical dependency treatment. Dr. Desmonde did not review any of the medical records dated after November 2, 2006, the date McGrath's sustained sobriety began. Similarly, Dr. Bork's August 2005 statement that "work rehabilitation appears indicated" suffers from the same deficiency.

Additionally, the ALJ relied on, and in fact adopted, Dr. Fredericksen's RFC opinion. The ALJ failed to recognize that Dr. Fredericksen's opinion was based on review of medical records on January 16, 2006. (*Id.* at 294-307.) This is important because McGrath did not maintain sobriety until November 2006, he had two "slips" after chemical dependency treatment in November 2005, and he was drinking alcohol until two days before his consultative examination with Dr. Desmonde. In other words, McGrath's treatment for mental impairments during his period of sustained sobriety occurred after Drs. Fredericksen's and Desmonde's evaluations.

Because the ALJ found that McGrath had periods of disability from substance abuse that did not last a continuous period of twelve months, the ALJ should have focused his evaluation of McGrath's RFC on the medical records from periods when McGrath was abstaining from alcohol.  None of the records reviewed by Dr. Fredericksen were dated after January 16, 2006.  Not surprisingly, Dr. Fredericksen discounted McGrath's mental impairments because they were related to his substance abuse and "lifestyle choices."  Her opinion did not take into account McGrath's limitations that remained after he abstained from alcohol; therefore, the ALJ should not have adopted her RFC opinion.  *See* 20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3) (the ALJ should evaluate the degree to which the nonexamining physician considered all of the pertinent evidence regarding a claim).

The Court also finds certain conclusions made by the ALJ are not supported by substantial evidence in the record.  The ALJ stated, "[t]he objective medical evidence shows no ongoing mental health care, and no ongoing mental health symptoms." (Admin. R. at 26.)  This is obviously inaccurate, no less so because the ALJ recognized "the evidence shows some situational anxiety or depression exacerbations when he runs out of funds and has housing problems."  As discussed previously, the fact that McGrath's living arrangement exacerbated his mental impairments is immaterial where the evidence as a whole suggests McGrath responded to difficulties in life by abusing substances, and when sober, becoming severely depressed and anxious.[12]

---

[12]     Even before he applied for disability, McGrath reported having experienced the following psychological problems during his lifetime, unrelated to drugs and alcohol:  serious depression, serious anxiety or tension, trouble understanding, concentrating, or remembering, trouble controlling violent behavior, serious thoughts of suicide, and attempted suicide.  (Admin. R. at 253.)  He was diagnosed with depression and anxiety in 1996.  (*Id.* at 257.)

McGrath stated on more than one occasion that he hated his life, a life Dr. Miles described as "very, very lonely." Under the circumstances, anxiety and depression are not merely "situational." The Court notes the ALJ obviously did not have the benefit of reviewing the medical records that were created after his disability determination on January 8, 2009. Nonetheless, the Court must consider the new records because they were considered by the Appeals Council and included in the Administrative Record. *Mackey*, 47 F.3d at 953. When these records are considered as part of the record as a whole, substantial evidence in the record does not support the ALJ's decision, particularly his finding that McGrath's symptoms improve and stabilize when he is clean and sober.

Contrary to the ALJ's conclusion, McGrath was compliant with his medications after his chemical dependency treatment ended in November 2005, because his medications were administered to him at Reed's Board and Lodging. McGrath's improved mental status with use of medication was partial and short-term, as evidenced by his ups and downs with depression and anxiety from November 2006 through 2009, and the fact that his daily activities remained very limited. When analyzing the evidence to determine a claimant's mental RFC:

> "it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses." . . . SSR 85-16 further specifies that "consideration should be given to . . . the [q]uality of daily activities . . . [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered."

*Reed*, 399 F.3d at 922 (8th Cir. 2005) (emphasis in original) (quoting Social Security Ruling 85-16, 1985 WL 56855 (S.S.A.). The ALJ did not analyze the evidence in this manner. Ironically, if the administrative process had been faster, McGrath may not have sustained a period of

sobriety sufficient to establish that he was disabled by his mental impairments when he stopped using alcohol.

Even if this Court did not find that McGrath met a listed impairment, remand is necessary for further development of the record to obtain a medical opinion that takes into account all of the evidence, and reconsideration of McGrath's RFC consistent with the Court's findings of errors in the ALJ's RFC evaluation.

## IV.   RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment [Doc. No. 10] be **GRANTED**; and the case be remanded for reversal and award of benefits consistent with this decision;

2. Defendant's Motion for Summary Judgment [Doc. No. 16.] be **DENIED**;

3. Judgment be entered and the case be dismissed.

Dated: January 24, 2012

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **February 7, 2012**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.