**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Edward McGrath,

                Plaintiff,              **MEMORANDUM OPINION**
                                        **AND ORDER**
   v.                             Civil No. 10-4192 ADM/SER

Michael Astrue, *Commissioner of Social*
*Security*,

                Defendant.

_____

Lionel H. Peabody, Esq., Peabody Law Office, Duluth, MN, on behalf of Plaintiff.

David W. Fuller, Esq., United States Attorney's Office, Minneapolis, MN, on behalf of
Defendant.

_____

## I.  INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on

Defendant Michael Astrue's (the "Commissioner") Objection [Docket No. 21] to Magistrate

Judge Steven E. Rau's January 24, 2012 Report and Recommendation [Docket No. 20] (the

"R&R").  Judge Rau recommended granting Plaintiff Edward McGrath's ("McGrath") Motion

for Summary Judgment [Docket No. 10] and denying the Commissioner's Motion for Summary

Judgment [Docket No. 16].  Judge Rau further recommended remanding this case to

Administrative Law Judge David K. Gatto (the "ALJ") for an award of Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI").  For the reasons set forth below,

the Commissioner's Objection is sustained in part, overruled in part.  The case is remanded for

further proceedings before the ALJ.

## II.  BACKGROUND

The facts and procedural history of this matter are set forth thoroughly in Judge Rau's R&R, and are incorporated by reference.  Accordingly, only a brief and abridged version of the relevant facts is presented below.

### A.  Factual Background

McGrath earned a B.A. from the State University of New York in 1981.  Admin. R. [Docket No. 6] at 33, 127, 325.  From 1992 to 2005, he held several jobs for short periods of time, with the longest being a sales representative from 1993 to 1995.  Id. at 131.  Throughout his life he has struggled with addiction and depression.  See id. at 191 (noting that as of August 2001, McGrath "has had a long history of alcohol dependence, some history of depression").  McGrath has four criminal convictions related to drunk driving.  Id. at 188.  He had three convictions in 1996 and lost his driver's license.  Id. at 34–35.

McGrath's medical history of record begins in 2001.  On July, 17 2001, he was admitted to a Saint Alphonsus Regional Medical Center in Boise, Idaho for chest pain.  Id. at 196.  During his examination, McGrath admitted to drinking, depression, and past suicidal ideation.  Id. at 197.  His treating doctor, Dr. Henzler, noted he had a "flat affect" and appeared sad.  Id. at 196.  Dr. Henzler did a Beck depression inventory, and McGrath scored 27, which is in the high range of depression.  Id. at 197.  Dr. Henzler prescribed Zoloft and advised McGrath to seek alcohol dependency treatment.  Id. at 196.  Shortly thereafter, on August 23, 2001, McGrath voluntarily admitted himself into Intermountain Hospital, a hospital for severe depression in Boise, Idaho. Id. at 191.  He was diagnosed by Dr. Kent with bipolar affective disorder, depressed versus major depressive disorder, and alcohol dependence.  Id. at 192.  Dr. Kent assessed McGrath with

a Global Assessment of Functioning Scale ("GAF") score of 35 and prescribed Celexa.  Id.  On

August 28, 2011, when McGrath was discharged from Intermountain Hosptial, his GAF was 55.

Id. at 187.  A little over a week later, McGrath returned to Saint Alphonsus Regional Medical

Center after being assaulted, but left the hospital without treatment.  Id. at 194–95.  The

following day he arrived at the emergency room intoxicated complaining of the assault.  Id. at

211–12.

The record suggests some four years passed without medical incident for McGrath.

Then, on August 14, 2005, McGrath was seen in the emergency room at St. Mary's Medical

Center in Duluth, Minnesota, after consuming Methadone and alcohol in a suicidal overdose

attempt.  Id. at 289.  McGrath was referred to Miller Dwan Medical Center ("Miller Dwan"),

where Dr. Bork prescribed fluoxetine and referred McGrath for chemical dependency evaluation.

See id. at 225.  He was discharged from Miller Dwan on August 23, 2005.  Id. at 228.  On

discharge he was diagnosed with adjustment disorder with disturbance in mood, depressed;

status post overdose; marijuana dependency; alcohol dependency binge pattern; history of

narcotic abuse and dependency.  Id.  His GAF on discharge was 50.  Id.  On August 30, 2005, he

went to Behavioral Health Access Center and stated he was suicidal and contemplating robbing a

bank.  Id. at 214.  He was again admitted to Miller Dwan under the supervision of Dr. Bork.  Id.

at 215.  Dr. Bork assessed a GAF score of 30.  Id. at 226.  Dr. Bork diagnosed McGrath with

depressive disorder, not otherwise specified; adjustment disorder with disturbance in mood; and

marijuana dependence.  Id.  He had stopped taking fluoxetine, and the medication was

reinitiated.  Id.

McGrath was transferred about a week later to chemical dependency treatment at Aurora/Four

3

Winds Program ("Aurora").  Id. at 245.  At Aurora, McGrath was diagnosed with polysubstance dependence; alcohol dependence; cannabis dependence; opiate dependence; depressive disorder NOS; and anxiety disorder NOS.  Id. at 246.  On November 2, 2005, McGrath was discharged due to conflicts with a counselor and other "negative behaviors."  Id.

About two months later, in January 2006, Dr. Sharon Frederiksen, a state psychological consultant, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment for McGrath.  Id. at 294–311.  Dr. Frederiksen opined that McGrath had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation of extended duration.  Id. at 304.  Dr. Frederiksen further opined that McGrath could carry out limited tasks in a work setting with brief contact with co-workers and the public.  Id. at 310.

Also in January 2006, McGrath saw Dr. Alan Johns.  Id. at 363.  Dr. Johns diagnosed chronic depressive disorder with chemical dependency issues and prescribed Zoloft.  Id. at 364.  On February 9, 2006, McGrath saw Alice Skadsberg, RN, CNS ("Skadsberg").  Id. at 359.  He admitted to using alcohol twice since his treatment at Aurora and admitted continuing use of marijuana several times per week.  Id. at 360.  Skadsberg diagnosed depressive disorder; anxiety state, unspecified; and borderline personality disorder.  Id.  She assessed a GAF score of 55 "with suicidal thought."  Id.

In March 2006, McGrath saw Dr. Johns again and reported that his depression was improving.  Id. at 358.  The very next week, however, Skadsberg increased his Seroquel to treat panic and anxiety and increased his Zoloft dosage.  Id. at 357.  Skadsberg also scheduled him for

4

partial hospitalization at Miller Dwan.  Id.

On June 14, 2006, McGrath was admitted to Miller Dwan for partial hospitalization to treat depression.  Id. at 312.  His GAF at admission was assessed at 40.  Id.  He discontinued the seven-day program after only three days, citing his anxiety in group treatment.  Id.  On July 7, 2006, McGrath saw Kathleen Campbell, RN, CNP ("Campbell").  He asked to be prescribed Ativan for his anxiety, but Campbell declined and referred McGrath to a psychiatrist.  Id. at 318–19.

In November 2006, McGrath was examined by Dr. Marcus Desmonde regarding his application for benefits.  Id. at 324–27.  McGrath told Dr. Desmonde that he lived in a board and lodging facility with three other adults, and spent most days sleeping and watching television.  Id. at 326.  He stated that he got along "pretty good" with the other residents.  Id.  He stated that he had consumed alcohol several days prior, and was a user of marijuana.  Id.  Dr. Desmonde diagnosed alcohol dependence; marijuana dependence; mood disorder secondary to alcohol and marijuana dependence; and major depressive disorder.  Id. at 327.  He opined that McGrath's GAF score had ranged between 40 and 45 over the last six months.  Id.  Dr. Desmonde further opined that McGrath "would be able to carry out tasks within limitations," but stated "[McGrath] would have difficulty interacting with supervisors, co-workers and the general public, and would not be able to tolerate the stress and pressure of competitive employment at this time."  Id.  Dr. Desmonde stated that with successful chemical dependency treatment McGrath "may well enhance his abilities to return to employment in the future."  Id.

Shortly after his examination with Dr. Desmonde, on November 8, 2006, McGrath saw psychologist Todd Heggestad ("Heggestad").  Id. at 352.  Heggestad taught McGrath relaxation

techniques, and the next month McGrath reported to Skadsberg he had noted improvement but still suffered some difficulties.  Id. at 351–52.

On May 16, 2007, McGrath reported to Dr. Johns that he had worsening depression, focused primarily on his housing situation, and McGrath requested to see a psychiatrist.  Id. at 348.  McGrath again saw Skadsberg on June 21, 2007, and he reported anger and isolation problems.  Id. at 347.  Skadsberg discontinued Zoloft and prescribed Remeron and Risperdal.  Id. McGrath saw Skadsberg a month later and reported feeling excited about the possibility of altering his living situation.  Id. at 346.  Nonetheless, Skadsberg increased his Remeron dosage. Id.

Five months later, in February 2008, McGrath saw Skadsberg again, and reported his worse depression ever, particularly because he was unable to change his housing situation.  Id. at 345.  McGrath reported he was not drinking, but admitted to using marijuana, although he stated he had reduced his use.  Id.  Skadsberg again increased McGrath's medications.  Id.  By the following month, McGrath reported to Dr. Johns that he was feeling better.  Id. at 344.  In May and June, he saw health care providers, his depression was noted, but no medication change or other enhanced treatment was ordered.  Id. at 340–41.

In January 2009, McGrath saw Skadsberg again and reported sleeping problems and suicidal thoughts.  Id. at 387.  Skadesberg increased his medications and temporarily added Klonopin.  Id.  McGrath saw Skadesberg again in February; she reported he was rocking, restless, and looked ill.  Id. at 386–87.  She discontinued Risperdal and Remeron and started McGrath on Ambien.  Id.  Two days later, on February 6, 2009, McGrath underwent a psychological rehabilitation evaluation with Heggestad.  Id. at 394.  McGrath was rocking back

and forth and his legs were shaking.  Id.  He reported continued sleeping problems and suicidal

thoughts occasioned by his denial of benefits.  Id. at 394–95.  He scored 49 on the Beck

Depression Inventory, indicating severe depression.  Id. at 395.  Heggestad assessed a GAF score

of 50.  Id. at 395.  On February 9, 2009, McGrath was admitted to St. Luke's Hospital; he had

been unable to sleep, was agitated, and had suicidal thoughts.  Id. at 372.  He admitted smoking

marjuana in the last few days, but denied alcohol use.  Id.  Psychologist Nancy Rectenwald

("Rectenwald") interviewed McGrath.  See id. at 376–78.  She noted "he has really no

connections to anyone in the world."  Id. at 377.  Rectenwald diagnosed anxiety disorder NOS,

and social anxiety.  Id. at 378.  She assessed a GAF score of 50.  Id.  He was discharged from St.

Luke's on February 23, 2009.  Id. at 370.  His treating phsycian at St. Luke's, Dr. Miles,

increased Zoloft and added Ativan and Abilify.  Id. at 371.  Dr. Miles recommended following

up with partial hospitalization.  Id.  On March 23, 2009, McGrath began partial hospitalization at

Miller Dwan.  Id. at 384.  His GAF on admission was 48.  Id.  He completed the partial

hospitalization with only one day of absence (of an eleven-day course), and was discharged on

April 10, 2009.  Id.  Upon discharge, a social worker noted he had increased hope, motivation,

and self-esteem.  Id. at 385.  His GAF score was assessed as 65.  Id.

In April 2009 visits to Heggestad and Skadsberg, McGrath reported sleeping better and

improved mood and motivation.  Id. at 386, 392.  McGrath saw Heggestad in June and August of

2009, McGrath reported that he was exercising and socializing more, but his depression was "up

and down."  Id. at 389–90.

### B.  Procedural Background–the ALJ's Decision and R&R

On November 4, 2005, McGrath applied for DIB and SSI benefits, alleging disability

beginning on December 31, 2001.  Admin. R. at 88–95.  By letters dated March 2, 2006, McGrath's claims for benefits were denied.  Admin. R. at 51–60.   On May 2, 2006, McGrath requested reconsideration.  Id. at 61.  On November 8, 2006, reconsideration was denied.  Id. at 94–69.

On December 29, 2006, McGrath requested an administrative hearing.  Id. at 70.  On July 15, 2008, the hearing was held.  Id. at 30.  The ALJ issued a denial of benefits on January 8, 2009.  Id. at 16–29.  The ALJ found that McGrath was not disabled using the five-step analysis articulated in 20 C.F.R. §§ 404.1520(a), 416.920(a).  The five-step analysis requires considering (1) whether the applicant is doing any substantial gainful activity, (2) whether the applicant has a severe medically determinable physical or mental impairment, (3) whether the impairment meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), (4) whether the applicant can engage in past work, given his residual functional capacity, and (5) whether, given an applicant's residual functional capacity, the applicant can adjust to other work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  On steps (1) and (2), the ALJ found that McGrath was not engaging in any substantial gainful activity and that he had a severe medically determinable mental impairment.  Admin. R. at 21.  On step (3), however, the ALJ determined McGrath did not have an impairment or combination of impairments meeting a Listing.  Id. at 22–23.

Section 12.00 of the Listings addresses mental disorders.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(A).  Listings 12.02, 12.03, 12.04, 12.06, have three sets of criteria, known as A, B, and C criteria.  Id.  A claimant is considered disabled if he meets the A criteria and either the B or C criteria.  Id.  The B criteria, however, are always assessed before the C criteria.  Id.

McGrath contends he met Listings 12.04 and 12.06.  Under Listing 12.04's A criteria, a claimant must demonstrate "[m]edically documented persistence" of at least one of a number of disorders.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(A).  Next, under the B criteria, a claimant must demonstrate at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(B).  If a claimant does not meet the B criteria, under the C criteria he must demonstrate:

> Medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms currently attenuated by medication or psychological support, and one of the following:
> 1.  Repeated episodes of decompensation, each of extended duration; or
> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C).

Listing 12.06 has dissimlar A and C criteria, however, its B criteria is identical to that of Listing 12.04.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.06.  The dispute between the parties focuses on whether McGrath met the B criteria of Listings 12.04 and 12.06, or the C criteria of Listing 12.04.

The ALJ found McGrath did not meet the criteria.  Admin. R. at 22–23.  Concerning the B criteria of Listings 12.04 and 12.06, the ALJ found McGrath had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to

concentration, persistence, or pace; and no episodes of decompensation of extended duration.  Id. With respect to the C criteria of Listing 12.04, the ALJ found "the evidence fails to establish the presence of the 'paragraph C' criteria."  Id. at 23.

The ALJ also made an assessment of McGrath's residual functional capacity, as required for steps (4) and (5) of the five-step assessment.  The ALJ found that McGrath could perform "a full range of work at all exertional levels but [] limited to unskilled or low-end semi-skilled tasks, with no more than brief and superficial contact with the public and co-workers; and, no rapid or frequent changes in work routine to allow for reduced stress tolerance."  Id. at 23. Given that residual functional capacity coupled with testimony from a vocational expert, the ALJ found that McGrath could perform his past work as an appointment setter or telemarketer.  Id. at 28.  On that basis, too, the ALJ found that McGrath was not disabled.  Id.

On February 26, 2009, McGrath requested a review of the ALJ's decision by the Social Security Administration Appeals Council.  Id. at 7–8.  In support of his request, McGrath submitted additional evidence.  Id. at 5.  On September 24, 2010, the Appeals Council denied the request for review.  Id. at 1–4.

On October 12, 2010, this federal court action followed.  Both parties moved for summary judgment, and the matter was referred to Magistrate Judge Rau.  Judge Rau concluded that substantial evidence in the record did not support the ALJ's decision, and recommended granting McGrath's motion for summary judgment and remanding the case for an award of benefits.  In particular, Judge Rau reported that the ALJ's findings with respect to McGrath's restriction in the activities of daily living and difficulties in maintaining social functioning were not supported in the record.  Judge Rau found both areas were areas of marked difficulty.  Judge

Rau further reported that the ALJ's residual functional capacity determination was erroneous because it did not account for McGrath's limited functioning even after sobriety post-November 2006. The Commissioner now objects to the R&R.

## III. DISCUSSION

### A. Standard of Review

#### 1. Objections to the R&R

A district court must make an independent, de novo review of those portions of an R&R to which a party objects and "may accept, reject, or modify, in whole or part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. LR 72.2(b).

#### 2. Review of ALJ's Decision

The Commissioner's decision to deny social security benefits must be affirmed if it conforms to the law and is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). The reviewing court must consider both evidence that supports the Commissioner's decision and evidence that detracts from it, and the reviewing court must uphold the Commissioner's decision if it is supported by substantial evidence, even when substantial evidence exists in the record that would have supported a contrary decision or when the reviewing court would have reached a different conclusion. Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).

**B. Commissioner's Objections to the R&R are Sustained in Part and Overruled in Part**

The Commissioner objects to several aspects of the R&R: (1) the analysis of McGrath's limitations in activities of daily living, (2) the analysis of McGrath's social functioning limitations, (3) the analysis of McGrath's residual functioning capacity, and (4) the recommendation that the case be remanded for an award of benefits rather than remanded merely for further proceedings.

**1. Restrictions in the Activities of Daily Living**

The ALJ found that McGrath had mild restrictions in the activities of daily living, but Judge Rau determined that substantial evidence did not support that finding. The Court respectfully disagrees with Judge Rau's analysis. McGrath lives at a facility where others take care of many tasks of daily living–grocery shopping, meal preparation, cleaning, scheduling appointments, and other activities. McGrath's daily activities consist of little more than sleeping, walking, watching television, and occasionally using marijuana. Judge Rau correctly noted that doing simple tasks, such as doing laundry or taking a daily walk, will not preclude a finding of marked limitation. See Reed v. Barnhart, 399 F.3d 917, 922–23 (8th Cir. 2005) (holding ability to do simple tasks such as fixing meals, watching movies, checking mail, and doing laundry not inconsistent with finding of disability). However, the converse is also true. Merely because a claimant lives in a boarding house that provides many daily necessities for him, and therefore obviates the need for him to undertake the tasks himself, does not *necessitate* a finding of disability. See Gordon v. Astrue, No. 10-0904, 2011 WL 2532933, at *16 (W.D. Mo. June 24, 2011) (noting plaintiff's claim of inability to perform daily activities was not

supported by evidence notwithstanding claim that he spent most of his time sleeping and lived in an assisted living center).

Rather, the question, as always, is whether McGrath's limitations are "marked" or something less. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04(B), 12.06(B). "Marked" means more than moderate but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C). A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such that it interferes seriously with the ability to function independently, appropriately, effectively, and on a sustained basis. Id.

In the context of the activities of daily living, "marked" is defined in reference to the nature and overall degree of interference with function. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C)(1). For example, ability to perform a wide range of activities of daily living may still lead to a finding of marked restriction in daily activities if there is serious difficulty performing tasks without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruption or distraction. Id.

Substantial evidence exists in the record to find that McGrath suffered less than marked limitation in daily living. Although he cannot drive because he has no license due to his convictions for alcohol-impaired driving, McGrath testified that he likely could drive if he had a license. Admin. R. at 35 ("Q[:] If you had a license . . . would you be able to drive? A[:] I believe so . . . . I think so."). McGrath has also repeatedly evinced a belief that he can live independently without assistance from the staff at his facility. He repeatedly told health care providers that he wished to live on his own. He testified before the ALJ that he wanted to live

on his own but was worried about "what kind of place to get." Id. at 36.  Additionally, when

asked if he could provide meals, take his medications, and go to appointments without help, he

said "I think so."  Id.  Judge Rau noted that the ALJ overemphasized McGrath's sobriety issues

in analyzing McGrath's housing situation, even though he has been sober for years.  The record,

however, indicates that McGrath may live at the boarding facility solely because he cannot

afford to live anywhere else, not because he is in need of assistance due to sobriety problems or

other reasons.  Furthermore, the record reflects McGrath can navigate the Duluth bus system, do

his own laundry, and manage his own finances, all independently.  Therefore, substantial

evidence exists to support the ALJ's finding that McGrath had less than marked limitation in

activities of daily living.

### 2.  Difficulties in Maintaining Social Functioning

Judge Rau also reported that substantial evidence did not exist to support the ALJ's

finding that McGrath had less than marked difficulties in social functioning.  Judge Rau reported

the only evidence in the record of less than marked difficulties was McGrath's remark to Dr.

Desmonde that McGrath got along "pretty good" with the others living in his boarding facility.

Judge Rau then explained that "[t]he overwhelming bulk of evidence is that McGrath was

impaired markedly in social functioning due to his severe isolation and anger management

problems, even when abstaining from alcohol."  R&R 25.  However, even if substantial evidence

supports a result contrary to the ALJ's decision or if the Court would decide facts differently, the

Court must affirm the ALJ's findings if supported by substantial evidence.  Tellez v. Barnhart,

403 F.3d 953, 956 (8th Cir. 2005).

In the context of social functioning, "marked" is defined again in reference to the nature

and overall degree of interference with function.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, §

12.00(C)(2).  For example, if an individual is highly antagonistic, uncooperative, or hostile, but

is tolerated by local merchants, that behavior would nonetheless support a finding of "marked"

limitations because such behavior is not acceptable in other social contexts.  Id.

In his Objection, the Commissioner cites evidence of record beyond McGrath's "pretty

good" comment that supports the ALJ's finding of less than marked limitation.  Specifically, the

Commissioner notes that in August 2007, Skadsberg noted McGrath's isolation was improving

and had people helping him get going.  In May 2008, Skadsberg noted McGrath "[says] he is

doing much better being around people, but still tends to stay to himself."  Admin. R. at 341.  In

June 2009,[1] McGrath told Heggestad that he was "more socially engaged by making [an] attempt

to socialize with members of [his living facility]."  Id. at 390.  Furthermore, health care providers

routinely noted that McGrath was pleasant and sociable.  Dr. Frederiksen diagnosed only

moderate restriction in social functioning.  Admin. R. at 304.

Judge Rau discounted Dr. Frederiksen's opinion because it was made before McGrath

had an extended period of sobriety.  McGrath's abstention from alcohol is highly commendable,

and the persistence of his symptoms is lamentable.  However, it should be noted that McGrath is

not entirely sober as he continues to use marijuana.  Should he abstain from marijuana as well as

alcohol, there may be improvement in his demeanor.  See 43 McGeorge L. Rev. 91, 103 (2012)

("[H]eavier marijuana use has been shown to increase the association with anxiety and

depression.").

---

[1] The evidence from January 2009 to June 2009 was not before the ALJ, but was
submitted to the Appeals Council.  Therefore, it forms part of the record for the purposes of
determining whether substantial evidence exists to support the ALJ's decision.  Mackey v.
Shalala, 47 F.3d 951, 953 (8th Cir. 1995).

The discussion regarding substance abuse, however, is largely irrelevant at this stage because the ALJ did not consider its effect.  <u>See</u> Admin. R. at 28 ("While the record is indicative of disability during episodes of substance abuse, there is no objective indication that any of these episodes have lasted for a continuous period 12 months or more during the period at issue."). Rather, the ALJ determined that McGrath was not disabled, even considering symptomology related to his substance abuse.  <u>Id.</u>  There has been no suggestion that McGrath's social functioning *worsened* after his abstention from alcohol.  To the contrary, the highest GAF score on record for McGrath (65) occurred in April 2010 after his abstention from alcohol.  <u>See id.</u> at 385.  Therefore, McGrath's level of social functioning prior to November 2006[2] is still relevant. If he had less than marked difficulty prior to November 2006, it is reasonable to infer he still had less than marked difficulty afterward.  Furthermore, his recent records include evidence supporting the conclusion that McGrath suffers less than marked difficulty in social functioning. Viewing the evidence as a whole, substantial evidence exists to support the ALJ's decision regarding social functioning.

### 3.  Residual Functional Capacity

 Because substantial evidence exists to support the ALJ's decision as it relates to Listing 12.04, the Commissioner's objections as they relate to the R&R's discussion of the B criteria of Listings 12.04 and 12.06 are sustained.  With those objections sustained, it becomes necessary to consider the parties' motions for summary judgment as they relate to the C criteria of Listing

---

[2] Judge Rau recommended an amended disability onset date of November 2006, as the beginning of McGrath's abstention for alcohol.  Because the ALJ did not expressly consider the materiality of McGrath alcohol and drug use, the Court will leave it to the discretion of the ALJ to amend the disability onset date after further factual development.

12.04, an issue not reached by Judge Rau.  Because the Court will deny both motions for summary judgment and remand for further proceedings, the Commissioner's objections as they relate to the R&R's discussion of residual functional capacity are overruled as moot.  See 20 C.F.R. §§ 404.1520(d)-(e), 416.920(d)-(e) (noting that residual functional capacity not assessed if claimant meets a Listing).

### C.  Motions for Summary Judgment Are Denied

In addition to arguing issues related to McGrath's limitations in social functioning and daily activities in their motions for summary judgment, the parties also disputed whether McGrath suffered repeated episodes of decompensation of extended duration as an element of the B criteria of both Listing 12.04 and Listing 12.06.  With respect to the C criteria of Listing 12.04, whether McGrath suffered repeated episodes of decompensation is the sole issue in dispute between the parties.  The ALJ found that McGrath "has experienced no episodes of decompensation, which have been of extended duration."  Admin. R. at 23.  This finding was in accord with Dr. Frederiksen's conclusion that McGrath has experienced no such episodes.  Id. at 304.

"Episodes of decompensation are exacerbations or temporary increase in symptoms . . . accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C)(4).  In light of that express definition, courts have warned against applying medical definitions of decompensation that may be too narrow.  See Larson v. Astrue, 615 F.3d 744, 750 (7th Cir. 2010) (noting that episodes of decompensation is not a self-defining phrase and noting that reviewing psychologist

17

"took an approach [to decompensation] that was too narrow in light of the definitions that the Social Security Administration uses"). In the context of mental health, decompensation is most often evidenced by changed living conditions signaling the need for a more structured psychological support system or a significant alteration in medication. Id.

The C criteria of Listing 12.04 requires "repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C)(1). The frequency of episodes of decompensation that generally qualifies as "repeated" is three within one year, or an average of once every four months. 20 C.F.R. Pt. 404, Subpt. P, App'x 1. What constitutes "extended duration" is generally a period that lasts at least two weeks. Id. Frequency and duration, however, are analyzed together. Therefore, more frequent episodes of shorter duration or less frequent episodes of longer duration may be "repeated episodes of decompensation, each of extended duration." Id.

The ALJ's finding that McGrath suffered *no* episode of extended decompensation is not supported by substantial evidence. Dr. Frederiksen did opine in 2006 that McGrath had suffered no extended decompensation. However, as noted above, medical definitions of decompensation are not necessarily contiguous with the legal definition of decompensation. McGrath's suicidal behavior beginning in August 2005, which included hospitalization and the addition of flouxetine as medication followed by re-hospitalization and then commitment to Aurora until November 2005, could reasonably be considered an episode of decompensation of extended duration.

Furthermore, the record is replete with evidence that McGrath suffered episodes of worsening symptoms that may qualify as decompensation *after* being evaluated by Dr.

18

Frederiksen.  For example, in March 2006, Skadsberg increased McGrath's medication dosages and recommended partial hospitalization.  Admin. R. at 357.  In June 2006, he was admitted for partial hospitalization but did not complete his tenure.  Id. at 312.  In July 2006, he was still complaining of anxiety and asking for medication alterations, and was referred to a psychiatrist.  Id. at 318–19.  On this record, McGrath appears to have been experiencing an episode of decompensation at least in March 2006.  Whether that episode was of extended duration, lasting until June or July 2006 for example, cannot be determined without further factual development.

In May 2007, McGrath reported worsening depression and requested a psychiatrist.  Id. at 348.  In June 2007, his medications were altered, and a month later, notwithstanding an improved demeanor, his Remeron dosage was increased.  Id. at 346–47.  As McGrath aptly notes, decompensation is not limited to time spent hospitalized.  Therefore, McGrath may have suffered an episode of decompensation from May 2007 until July 2007, or several smaller episodes therein.

Likewise, in February 2008, McGrath reported his worst depression ever, and his medications were increased.  Id. at 345.  He did not report improvement until a month later.  Id. at 344.  Again, McGrath may have suffered an episode of decompensation from February to March 2008.

In January 2009, McGrath reported suicidal thoughts, and his medication was altered to add Klonopin.  Id. at 387.  In February 2009, he was still demonstrating increased symptoms and his medication was altered again.  Id. at 386.  Several days later he was admitted to St. Luke's Hospital.  Id. at 372.  At St. Luke's his medication was altered yet again.  Id. at 371.  In March 2009, he completed partial hospitalization at Miller Dwan, not being discharged until April 2009.

Id. at 384–85.  Therefore, he may have suffered an episode of decompensation, or several smaller episodes, from January 2009 to April 2009.

Whether each of these incidents is an episode of extended decompensation or whether any episodes of decompensation were repeated with sufficient frequency to qualify McGrath as disabled under criteria C is still unclear.  Viewing the record on the whole, however, it is evident McGrath suffered at least a single episode of decompensation of extended duration, and therefore the ALJ's finding to the contrary is unsupported by substantial evidence.  Whether the number and frequency of those episodes necessitates a finding of a disability under criteria C, and to the extent drug dependency is material to that disability, requires further factual development.  The failure to develop those facts was prejudicial to McGrath as he may be entitled to benefits if he meets Listing 12.04's C criteria.  The ALJ's decision is reversed, this action is dismissed without prejudice, and this case is remanded to the ALJ for further proceedings.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Commissioner's Objection [Docket No. 21] is **SUSTAINED IN PART** and **OVERRULED IN PART**;

2. The Commissioner's Motion for Summary Judgment [Docket No. 16] is **DENIED**;

3. McGrath's Motion for Summary Judgment [Docket No. 10] is **DENIED**;

4. The ALJ's denial of DIB and SSI benefits is **REVERSED**;

5. This case is **REMANDED** for further proceedings; and

6.  All claims in the Complaint [Docket No. 1] are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 23, 2012.